## IAFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Joseph Iannelli, being first duly sworn, hereby depose and state as follows:

### Introduction and Agent Background

1.      I am a "federal law enforcement officer" within the meaning of Federal

Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in

enforcing the criminal laws and duly authorized by the Attorney General to request a

search warrant.  I have been a Task Force Officer (TFO) with the Drug Enforcement

Administration (DEA) since October of 2013 and am currently assigned to the DEA

Providence District Office (DEA-PDO).  I am also a member of the South Kingstown

Police Department and have been continuously employed by the Town of South

Kingstown since August of 2006.  Prior to being sworn in as a TFO I held the rank of

Detective with the South Kingstown Police Department.  As a Detective I was

responsible for investigating and prosecuting all types of criminal narcotic related

activity being carried out by traditional and non-traditional organized crime

organizations, members and their associates, in addition to investigating any and all

crimes which violated the laws of the State of Rhode Island.  I was also deputized under

numerous federal cases through The DEA Providence District Office where I assisted

with investigations and attended DEA's Basic Narcotics School.  Since being sworn as a

Task Force Officer with the DEA I have participated in countless investigations relating

to the possession and distribution of cocaine, heroin, marijuana as well as other

controlled substances.  Pursuant to my duties with the South Kingstown Police

Department and DEA, I have received training in state and federal drug laws, narcotics investigations, interdiction of narcotics and/or illegal proceeds, searches and seizures under the Fourth Amendment, asset forfeiture, and money laundering.  In this regard, I know that it is a violation of 21 U.S.C. §§ 841 to distribute, and to possess with intent to distribute, controlled substances.  Further, I know that it is a violation of 18 U.S.C. § 924(c) to possess a firearm in furtherance of a drug trafficking crime.

2.      As a Task Force Office of the DEA, I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.  I am a participating member of the Providence District Office which is comprised of personnel from the DEA, Providence Police Department, East Providence Police Department, Cranston Police Department, Central Falls Police Department, Coventry Police Department, Newport Police Department, North Kingstown Police Department, South Kingstown Police Department, Warwick Police Department, West Warwick Police Department, Woonsocket Police Department, Rhode Island State Police, Amtrak Police Department, and the Rhode Island State Attorney General's Office.

3.      I submit this affidavit in support of an application for the issuance of a search warrant authorizing the search of:

    a.  The person described as Jamont PATRICK (DOB 2/16/1992) (hereinafter referred to as SUBJECT PERSON or PATRICK), as

2

more particularly described in Attachment A-1 (attached hereto and incorporated herein by reference) for the items described in Attachment B-1, at whatever location he is found, regardless of the SUBJECT PERSON's location or proximity to the SUBJECT PREMISES, including any cellular telephones or digital storage devices he may have on his person;

b. the SUBJECT PREMISES, 50 Burns Street, Apartment 1, Providence RI, as more particularly described in Attachment A-2 (attached hereto and incorporated herein by reference), for the items described in Attachment B-2;

c. the SUBJECT PHONE, the Android cellular telephone owned and utilized by the SUBJECT PERSON, as more particularly described in Attachment A-3 (attached hereto and incorporated herein by reference), for the items described in Attachment B-3.

4.     For the reasons set forth below, I believe that PATRICK is a drug trafficker who has used a cellular telephone to commit drug trafficking offenses. I submit that there is probable cause to believe that the SUBJECT PHONE or other telephones used by him contains records and other evidence of the following offenses: distribution and possession with the intent to distribute more than 500 grams of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841 (a)(1) and (b)(1)(A)(viii) , and possessing a firearm during and in relation to a drug

3

trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (collectively, the "TARGET OFFENSES"). More specifically, as will be discussed below, I submit that there is probable cause to believe that the cellular telephone(s) used by PATRICK, as well as the SUBJECT PREMISES will contain evidence of the commission of a criminal offense or evidence which is contraband, the fruits of crime, or things otherwise criminally possessed, or which is designed or intended for use or which is or has been used as the means of committing an offense in violation of the TARGET OFFENSES.

### Probable Cause

5.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement agents. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. I have also relied on information provided to the DEA by a Confidential Informant who I will only refer to as "CI-1." In order to protect CI-1's identity, I will refer to CI-1 with a masculine pronoun regardless of CI-1's gender.

6.     CI-1 has been providing information to the government since 2021. CI-1 has a criminal history which includes state convictions for domestic assault, violation of a no-contact order, driving under the influence, and trespass. CI-1 also has a pending state charge of possession of a controlled substance. CI-1 is being paid for his cooperation, having received approximately $100 to date. Since the start of his cooperation with the DEA, he has provided information that I or other law enforcement

4

agents have independently corroborated through toll records, recorded conversations, video recordings, physical surveillance, and other law enforcement confidential sources.  He has proven to be a credible and reliable informant.  I have never found him to have provided false information.

7.      CI-1 has been purchasing what he believed was 3,4-Methylenedioxymethamphetamine (MDMA) from PATRICK for a number of months, having purchased MDMA from PATRICK approximately 40 times.

8.      On September 27, 2021, CI-1 contacted PATRICK via Facebook Messenger to arrange for a controlled buy of 13 pills of MDMA for $100 under DEA supervision. The call between CI-1 and PATRICK was recorded by DEA personnel.  PATRICK instructed CI-1 to meet him at the SUBJECT PREMISES.

9.      A records review of mail received at the SUBJECT PREMISES revealed that Jaidon De La Cruz, a woman known to be PATRICK's girlfriend, regularly received mail at that residence.  Additionally, a review of PATRICK's Facebook account revealed a photograph of PATRICK sitting on a car in front of the SUBJECT PREMISES.

10.     Prior to meeting PATRICK, DEA personnel established surveillance in the proximity of the SUBJECT PREMISES and searched CI-1 for contraband with negative results.  CI-1 met PATRICK in the parking lot of the SUBJECT PREMISES before entering the SUBJECT PREMISES, where CI-1 exchanged $100 for 13 pills, weighing approximately 35.4 grams, which PATRICK retrieved from a black shoebox inside the

apartment's living room.  This transaction was recorded via an undercover camera provided to CI-1.  CI-1 then departed the SUBJECT PREMISES.

11.     Following the transaction, CI-1 identified PATRICK from a photograph as the individual who sold him the pills.  The pills were taken into evidence and sent to a DEA laboratory for further analysis.  On October 25, 2021, the DEA laboratory that had received the pills reported that the pills had tested positive for methamphetamine.

12.     On October 5, 2021, CI-1 again contacted PATRICK via Facebook Messenger to arrange for a controlled buy of additional pills of MDMA for $300 under DEA supervision.   The call between CI-1 and PATRICK was recorded by DEA personnel.  PATRICK instructed CI-1 to meet him at the SUBJECT PREMISES.

13.     Prior to meeting PATRICK, DEA personnel established surveillance in the proximity of the SUBJECT PREMISES and searched CI-1 for contraband with negative results.  CI-1 was let into the SUBJECT PREMISES by PATRICK, who was in the SUBJECT PREMISES with a child believed to be PATRICK's young son.  PATRICK instructed the child to bring him a bag of pills and handed CI-1 a handful, weighing approximately 46.9 grams, in exchange for $300.  CI-1 estimates that the large bag of pills PATRICK's son brought to him contained approximately 1,000 pills.  CI-1 then departed the SUBJECT PREMISES.

14.     Following the transaction, CI-1 again identified PATRICK from a photograph as the individual who sold him the pills.  The pills were taken into evidence and sent to a DEA laboratory for further analysis.  On October 28, 2021, the DEA

laboratory that had received the pills reported that the pills had tested positive for methamphetamine.

15.     On October 7, 2021, CI-1 again contacted PATRICK via Facebook Messenger to arrange for a controlled buy of approximately 60 pills of MDMA for $500 under DEA supervision.  The call between CI-1 and PATRICK was recorded by DEA personnel.  PATRICK instructed CI-1 to meet him at the SUBJECT PREMISES.

16.     Prior to meeting PATRICK, DEA personnel established surveillance in the proximity of the SUBJECT PREMISES and searched CI-1 for contraband with negative results.  CI-1 arrived in the rear parking lot of the SUBJECT PREMISES and met PATRICK inside.  PATRICK then counted out approximately 60 pills, weighing approximately 55.6 grams,  and provided them to CI-1 in exchange for $400.

17.     After receiving the pills, CI-1 and PATRICK discussed a potential future deal of 200 pills for $950.  PATRICK then showed CI-1 a dark-colored revolver, allowing CI-1 to hold and examine it.  PATRICK stated that he had also bought another firearm, and that unspecified individuals were trying to kill him.  CI-1 noted in his statement to me that in June 2021, PATRICK had shown CI-1 a different, smaller revolver.  CI-1 then departed the SUBJECT PREMISES.

18.     Following the transaction, CI-1 again identified PATRICK from a photograph as the individual who sold him the pills.  The pills were taken into evidence and subjected to a field test, which returned positive for methamphetamine/MDMA. The pills were then sent to a DEA laboratory for further analysis, which is pending.

19.     On October 13, 2021, CI-1 again contacted PATRICK via Facebook Messenger to arrange for a controlled buy of approximately 150 pills of MDMA for $950 under DEA supervision.   The call between CI-1 and PATRICK was recorded by DEA personnel.  PATRICK instructed CI-1 to meet him at the SUBJECT PREMISES.

20.     Prior to meeting PATRICK, DEA personnel established surveillance in the proximity of the SUBJECT PREMISES and searched CI-1 for contraband with negative results.  CI-1 arrived in the rear parking lot of the SUBJECT PREMISES and met PATRICK inside.  Also present at the SUBJECT PREMISES were PATRICK's wife, a child believed to be PATRICK's son, and an unknown male.  PATRICK retrieved a large bag of pills, counted out approximately 153 pills, weighing approximately 82.5 grams, and provided them to CI-1 in exchange for $950.  CI-1 then departed the SUBJECT PREMISES.

21.     Following the transaction, CI-1 again identified PATRICK from a photograph as the individual who sold him the pills.  The pills were taken into evidence and subjected to a field test, which returned positive for methamphetamine/MDMA. The pills were then sent to a DEA laboratory for further analysis, which is pending.

22.     On October 25, 2021, CI-1 again contacted PATRICK via Facebook Messenger to arrange for a controlled buy of additional pills of MDMA for $2,000 under DEA supervision.   The call between CI-1 and PATRICK was recorded by DEA personnel.  PATRICK instructed CI-1 to meet him at the SUBJECT PREMISES.

23.     Prior to meeting PATRICK, DEA personnel established surveillance in the proximity of the SUBJECT PREMISES and searched CI-1 for contraband with negative results.  CI-1 arrived in the vicinity of the SUBJECT PREMISES and called PATRICK via Facebook Messenger.  PATRICK informed CI-1 that he only had 300 pills, but that his supplier was arriving shortly.  CI-1 briefly departed the area but returned after receiving a call from PATRICK, who stated his supplier had arrived.

24.     After CI-1 arrived at the SUBJECT PREMISES, PATRICK came out of the SUBJECT PREMISES and provided CI-1 with two diapers containing pills, weighing approximately 177 grams, in exchange for $2,000 dollars.  CI-1 exited the area shortly thereafter.

25.     Following the transaction, CI-1 again identified PATRICK from a photograph as the individual who sold him the pills.  The pills were taken into evidence and subjected to a field test, which returned positive for methamphetamine/MDMA. The pills were then sent to a DEA laboratory for further analysis, which is pending.

26.     On November 3, 2021, CI-1 again contacted PATRICK via Facebook Messenger to arrange for a controlled buy of additional pills of MDMA for $2,000 under DEA supervision.   The call between CI-1 and PATRICK was recorded by DEA personnel.  PATRICK instructed CI-1 to meet him at the SUBJECT PREMISES.

27.     Prior to meeting PATRICK, DEA personnel established surveillance in the proximity of the SUBJECT PREMISES and searched CI-1 for contraband with negative results.  CI-1 parked in the SUBJECT PREMISES's rear parking lot, and PATRICK came

out of the SUBJECT PREMISES shortly thereafter.  PATRICK entered the CI-1's vehicle and provided CI-1 with a bag of pills weighing approximately 203 grams in exchange for $2,000.  This transaction was recorded via an undercover camera in CI-1's vehicle. PATRICK then exited CI-1's vehicle, and CI-1 exited the area.

28.     Following the transaction, CI-1 again identified PATRICK from a photograph as the individual who sold him the pills.  The pills were taken into evidence and subjected to a field test, which returned positive for methamphetamine/MDMA. The pills were then sent to a DEA laboratory for further analysis, which is pending.

### *Seizure of Electronic Devices*

29.     As described above, I believe that PATRICK is engaged in the TARGET OFFENSES and that he is using a cellular telephone or telephones, including the SUBJECT PHONE, in the commission of the TARGET OFFENSES.  Based on my training and experience, I believe probable cause exists that the SUBJECT PHONE and/or other electronic devices as described in Attachments B-1, B-2, and B-3 found on his person or in the SUBJECT PREMISES will contain evidence, fruits, and instrumentalities of the TARGET OFFENSES.

30.     Based on my training and experience, I know that drug traffickers commonly use cellular telephones and/or smartphones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where

the subscriber of the phone is not required to provide personal identifying information),

in an effort to thwart law enforcement's use of electronic surveillance.  Based on my

training and experience, drug traffickers often use multiple phones and change their

phone numbers frequently to avoid law enforcement detection.  A cellular telephone is

a handheld wireless device used for voice and text communication as well as for

accessing the internet.  Telephones send signals through networks of

transmitter/receivers called "cells," enabling communication with other wireless

telephones or traditional "land line" telephones.  A wireless telephone usually contains

a "call log," which records the telephone number, date, and time of calls and text

messages made to and from the phone.  In addition to enabling voice communications,

wireless telephones now offer a broad range of capabilities.  These capabilities include,

but are not limited to: storing names and phone numbers in electronic "address books;"

sending, receiving, and storing text messages and email; taking, sending, receiving, and

storing still photographs and moving video; storing and playing back audio files;

storing dates, appointments, and other information on personal calendars; and

accessing and downloading information from the Internet, including electronic mail

("email"), iMessages, Facebook Messages, WhatsApp messages, and other forms of

electronic communications.  Wireless telephones may also include global positioning

system ("GPS") technology for determining the location of the device.  Based on my

training, experience, and research, I know that many cellular telephones have

capabilities described above.  In my training and experience, examining data stored on

11

devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device as well as his criminal accomplices.  I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to further prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

31.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones and mobile phones can now function essentially as small computers.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

32.     Based on my training and experience, I know that Facebook Messenger is an application utilized on smartphones such as the SUBJECT PHONE as a communication/messaging application.  Facebook Messenger allows users the ability to send text messages, media files such as photographs or videos, and to make voice and/or video calls.

33.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that electronic files or remnants of such files can be recovered from smartphones and mobile phones months or years after they have been

written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true

because:

a.  Electronic files that have been downloaded to a storage medium can be
    stored for years at little or no cost.  Furthermore, when users replace their
    telephones, they can easily transfer the data from their old telephone to
    their new telephone.

b.  Even after files have been deleted, they can be recovered months or years
    later using forensic tools.  This is so because when a person "deletes" a file
    on a telephone, the data contained in the file does not actually disappear;
    rather, that data remains on the storage medium until it is overwritten by
    new data, which might not occur for long periods of time.  In addition, an
    operating system may also keep a record of deleted data in a "swap" or
    "recovery" file

c.  Wholly apart from user generated files, storage media—in particular,
    internal hard drives—contain electronic evidence of how the device has
    been used, what it has been used for, and who has used it.  This evidence
    can take the form of operating system configurations, artifacts from
    operating system or application operation, file system data structures, and
    virtual memory "swap" or paging files.  It is technically possible to delete
    this information, but users typically do not erase or delete this evidence
    because special software is typically required for that task.

d.  Similarly, files that have been viewed over the Internet are sometimes
    automatically downloaded into a temporary Internet directory or "cache."
    The browser often maintains a fixed amount of hard drive space devoted
    to these files, and the files are overwritten only as they are replaced with
    more recently viewed Internet pages or if a user takes steps to delete them.

34.    Based on all of the information that I have obtained in the course of this

investigation, and for the reasons more specifically set forth herein, I believe that

PATRICK used cellular telephones, including at a minimum the SUBJECT PHONE, in

the commission of the TARGET OFFENSES.  I believe that PATRICK uses smartphones

and/or telephones to facilitate the TARGET OFFENSES, to communicate with drug

13

suppliers, with customers (including CI-1), and with co-conspirators, and that

communications, records, appointments and other information will be found on their

smartphones/telephones, and that their smartphones/telephones will be found on or

near them. *See e.g., United States v. Feliz*, 182 F.3d 82, 87-88 (1st Cir. 1999).[1]

### Biometric Access

35.    The search warrant also requests authorization to use the biometric unlock

features of a device, based on the following, which I know from my training,

experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices. To
     use this function, a user generally displays a physical feature, such as a
     fingerprint, face, or eye, and the device will automatically unlock if that
     physical feature matches one the user has stored on the device. To unlock
     a device enabled with a fingerprint unlock function, a user places one or
     more of the user's fingers on a device's fingerprint scanner for
     approximately one second. To unlock a device enabled with a facial,
     retina, or iris recognition function, the user holds the device in front of the
     user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a
     device even if enabled, such as when a device has been restarted or
     inactive, has not been unlocked for a certain period of time (often 48 hours
     or less), or after a certain number of unsuccessful unlock attempts. Thus,
     the opportunity to use a biometric unlock function even on an enabled
     device may exist for only a short time. I do not know the passcodes of the
     devices likely to be found in the search.

c.   Thus, the warrant(s) I am applying for would permit law enforcement

---

[1] In *Feliz*, the First Circuit made clear that, in the drug trafficking context, evidence of drug transactions can be expected to be found in a drug trafficker's residence for months after evidence of the last transaction. 182 F.3d at 87 ("[C]ourts have upheld determinations of probable cause in trafficking cases involving [three months long] or even longer periods") (citing *United States v. Greany*, 929 F.2d 523, 525 (9th Cir. 1991) (two year-old information relating to marijuana operation not stale)).  As the First Circuit has explained "[b]y its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time."  *United States v. Nocella*, 849 F.2d 33, 40 (1st Cir. 1988).

personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the user's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of the user's face with her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

d. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### *Request to Seal*

36.     Because they reveal the existence of an ongoing investigation, I request that the warrant, this affidavit, and the accompanying applications in support thereof be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others, except that copies of the warrants in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrants.

15

*Conclusion*

37.     Based on the facts contained in this affidavit, I believe there is probable

cause to cause to believe that the requested search warrants will reveal evidence of

Federal Offenses committed by PATRICK, including, but not limited to the TARGET

OFFENSES.

38.     I, Joseph Iannelli, having signed this Affidavit under oath as to all

assertions and allegations contained herein, state that its contents are true and correct to

the best of my knowledge, information, and belief.

Respectfully submitted,

Joseph Iannelli
Task Force Officer

Attested to by the applicant in accordance with the requirements of Fed.R. Crim. P. 4.1 by telephone.

_____          _____
*Date*                                    *Judge's signature*

 Providence, RI_____          _____
*City and State*                           *Lincoln D. Almond, Magistrate Judge*

16